# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Matthew F. Kennelly | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 01 C 3059 | **DATE** | 10/10/2002 |
| **CASE TITLE** | Panthera vs. Village of Oak Lawn | | |

**MOTION:**

[In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due _____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
   ☐ FRCP4(m)   ☐ Local Rule 41.1   ☐ FRCP41(a)(1)   ☐ FRCP41(a)(2).

(10) ■    [Other docket entry]    For the reasons set forth on the attached order, defendant's motion for summary judgment (32-1) is granted as to Count 3 but is otherwise denied, and Panthera's motion for partial summary judgment (40-1) as to Count 3 is denied. On the Court's motion, the date for filing the final pretrial order is extended to 11/8/02. No further extensions of that date will be permitted.

(11) ■    [For further detail see order attached to the original minute order.]

| | | | | |
|---|---|---|---|---|
| | No notices required, advised in open court. | | | **Document Number** |
| | No notices required. | | number of notices | |
| | Notices mailed by judge's staff. | | | |
| | Notified counsel by telephone. | | OCT 16 2002 | 47 |
| ✓ | Docketing to mail notices. | | date docketed | |
| | Mail AO 450 form. | | docketing deputy initials | |
| | Copy to judge/magistrate judge. | | | |
| OR | courtroom deputy's initials | | date mailed notice | |
| | | Date/time received in central Clerk's Office | mailing deputy initials | |

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

CARLOS PANTHERA,                            )
                                            )
                    Plaintiff,              )
                                            )
        vs.                                 )     Case No. 01 C 3059
                                            )
VILLAGE OF OAK LAWN, CHIEF JAMES            )
HOUK, CAPTAIN VORDERER,                     )
LIEUTENANT TOM SIMON, LIEUTENANT            )
FRANK RAGLIONE and BOARD OF FIRE            )
AND POLICE COMMISSIONERS JOHN               )
C. FRIEL, WILLIAM EGAN and                  )
ROBERT BANAS.                               )
                                            )
                    Defendants.             )

## MEMORANDUM OPINION AND ORDER

MATTHEW F. KENNELLY, District Judge:

Plaintiff Carlos Panthera filed a complaint against defendants Village of Oak Lawn, Chief James

Houk, Captain Terrence Vorderer, Lieutenant Tom Simon, Lieutenant Frank Raglione and Board of

Fire and Police Commissioners John C. Friel, William Egan and Robert Banas, alleging that defendants

violated 42 U.S.C. §1983 by discharging him from the police force in retaliation for his exercise of his

First Amendment free speech rights (Count 1) and by subjecting him to differential treatment in violation

of the Equal Protection Clause (Count 2), and that the Board of Fire and Police Commissioners'

decision to discharge him was against the manifest weight of the evidence (Count 3). Defendants[1] seek

---

[1]     In his response to, and cross-motion for summary judgment, Panthera voluntarily
dismisses his claims against defendants Raglione and Simon. Pl. Resp., p. 35.

summary judgment on all of Panthera's claims. Panthera, in turn, has filed a cross-motion for summary judgment on Count 3. For the reasons set forth below, defendants' motion is granted in part and denied in part, and Panthera's motion is denied.

## FACTUAL BACKGROUND

Panthera was hired by the Oak Lawn Police Department (the "Department") as a patrol officer in or around 1996. At that time, Houk was the Department's Chief of Police, Vorderer was a Division Chief, Raglione was a lieutenant and Simon was a watch lieutenant. Pl. Facts ¶4; Def. Facts ¶¶4-10. All of these individuals held ranks superior to Panthera. Prior to June 2000, Chief Houk thought Panthera was a "good officer" who was "very attentive" and "was doing his job." Pl. Facts ¶5.

### A.    The Service Merchandise Call

On June 28, 2000, Panthera responded to a call at the Service Merchandise warehouse in Oak Lawn after an alarm went off. When he arrived, Lt. Raglione was already on the scene. In conducting an exterior search of the warehouse with Lt. Raglione, Panthera determined that the first set of doors at the entrance was unlocked, but that a second set of glass doors and the steel cage protecting the warehouse entrance were both locked. The officers returned to their respective squad cars and Panthera radioed that the building was "secure ground level," meaning that there was no form of entry into the building. Lt. Raglione countered that transmission, however, because the lights had come on inside the warehouse.

A Service Merchandise employee who had a key to the warehouse arrived and unlocked the doors for Panthera and Lt. Raglione. According to defendants, Lt. Raglione instructed Panthera to "wait for him" or "stay by him" after entering the warehouse, but Panthera searched the building on his

2

own without authorization. Def. Facts ¶¶ 28-30. Panthera admits that Lt. Raglione instructed him to wait for him but states that he followed that instruction. Pl. Resp. to Facts ¶29. At the same time, however, Panthera also admits that after receiving the instruction, he ended up searching the building on his own without Lt. Raglione's approval. According to Panthera, "he acted consistent with how he acted on every other similar call, and . . . direction from Lt. Raglione was neither requested nor expected under the circumstances." *Id.* ¶¶28-30. While searching the building, Panthera lost sight of Lt. Raglione; however, he did communicate with the Lieutenant at least once by radio and made several additional attempts to raise him without success. Pl. Facts ¶22. When Panthera returned, Lt. Raglione told Panthera that he did not know where he was and had been waiting for him. Def. Facts. ¶31-32.

After leaving the building, Lt. Raglione told Panthera that he wanted to discuss the fact that despite Panthera's report to the contrary, Lt. Raglione did not think the building was in fact secure when the lights came on inside the warehouse. Lt. Raglione also wanted to discuss Panthera's failure to wait for him as instructed. Def. Facts ¶33. Panthera claims that throughout the incident, Lt. Raglione was laughing and giggling with the Service Merchandise keyholder and "making [goo goo] eyes" at her. Pl. Facts ¶21. Panthera maintains that he was concerned about this behavior because "it might be repeated at future calls where the safety of the public could be at stake." *Id.* ¶23. Panthera told Lt. Raglione that he had tried to reach him several times by radio, to which Lt. Raglione responded that Panthera should have waited for him as instructed. Panthera Dep., pp. 50-51. Panthera did not want to argue with the Lieutenant and ultimately returned to the station where he went directly to Lt. Simon's office to discuss the alarm call. Pl. Facts ¶25.

3

Panthera told Lt. Simon that Lt. Raglione had been unprofessional during the call and had flirted and made "goo goo eyes" at the female keyholder. Def. Facts ¶¶38, 39. Panthera reported that Lt. Raglione failed to draw his weapon or respond to his radio, and suggested that this was because the Lieutenant was overly focused on the keyholder. Pl. Facts ¶26. Panthera also expressed displeasure at the fact that Lt. Raglione had called out the fire department at the end of the call, which he felt was "ridiculous." In addition, Panthera "made some indication that I had personal conflict with [Lt. Raglione], and that it's obvious that he is not interested in treating me fairly and said this is a perfect example, period. And I made an indication to him that yes, he has shown up on my calls and other officers have even asked me why Lt. Raglione more or less rides me." Panthera Dep., pp. 76-77; DX 14, pp. 37-38. Lt. Simon told Panthera that he would look into the matter and, shortly thereafter, he spoke with Lt. Raglione about the incident. Pl. Facts ¶27. At that time, neither Lt. Raglione nor Lt. Simon had any inclination to discipline Panthera. Simon Dep., pp. 58-62; Pl. Facts ¶36.

On June 30, 2000, Panthera returned to Lt. Simon's office to discuss the June 28 Service Merchandise call. According to Panthera, "I was upset that he seemed as though the entire issue around safety for the officers and safety of the civilians was blown off, and I could only see this happening again until somebody got hurt." Pl. Facts ¶28. Panthera reiterated his concerns to Lt. Simon, who informed him that he had spoken to Lt. Raglione and did not believe he had acted improperly. Panthera Dep., pp. 83-85. Panthera then asked whether another officer, Ruswick, had been reprimanded for leaving the scene of a burglary two weeks earlier. He stated that Lt. Simon was showing favoritism towards Lt. Raglione because of his rank, and that he (Panthera) would have been

disciplined if he had failed to draw his gun or investigate the scene. Def. Facts ¶49; Pl. Resp. to Facts ¶49.

After speaking with Panthera alone, Lt. Simon called Lt. Raglione into the office over Panthera's objection. Lt. Simon told Panthera that Lt. Raglione was his boss and was responsible for handling calls, which Panthera did not dispute. Panthera says that he continued to press his position that he was concerned about safety. Pl. Facts ¶31. He admits that during the conversation, he raised his voice, became argumentative, called Lt. Raglione by his first name, accused Lt. Raglione of giving him an illegal order, and told Lt. Raglione that he respected his rank but did not respect Lt. Raglione as a man. Def. Facts ¶¶51-55.

On July 1, 2000, Lt. Raglione wrote a memo to Lt. Simon indicating that he initially believed that the verbal correction he gave Panthera would be sufficient. However, based upon his subsequent conversations with Panthera and Lt. Simon, he requested that corrective disciplinary action be taken, such as education, a reprimand or a one-day suspension. PX E; Raglione Dep., p. 117. On July 9, 2000, Lt. Raglione wrote a memo to Captain Vorderer stating that he could not substantiate any allegation that Panthera had been insubordinate during either the June 28 Service Merchandise call or the meeting in Lt. Simon's office on June 30. He was careful, however, to note that he could not speak for Lt. Simon in that regard. Pl. Facts ¶41. Capt. Vorderer, who apparently had a stricter definition of the term insubordinate, believed that Lt. Raglione was mistaken in his conclusion. *Id.* ¶43. After Capt. Vorderer showed Lt. Raglione the written rule prohibiting insubordination, Lt. Raglione agreed that Panthera's conduct did fall within that definition. *Id.* ¶¶44-45; Def. Resp. to Facts ¶¶44-45.

**B.     The Les Brothers Restaurant Call**

Around midnight on July 6, 2000, Panthera responded to a call at Les Brothers Restaurant. Panthera arrived at the scene after the incident was over, but he transported one of the individuals in custody to the police station. When Panthera arrived at the lock-up, a second man in custody, Christopher Foltz, was extremely irate and hindering the booking process. Panthera asked Foltz why he was so upset and Foltz said that he had been wrongfully pepper-sprayed by one of the officers. Foltz also mentioned that his family was connected to the Cook County Sheriff and that he was going to retain a lawyer. Pl. Facts ¶¶46, 48-49. According to Panthera, he proceeded to calmly explain to Foltz, "in a manner calculated to assist in the completion of what had become a very difficult booking process," that if his story was true, he had a right to get an attorney. Pl. Facts ¶50. Defendants claim that Panthera told Foltz that he "could or should sue the Oak Lawn Police Department and the officer that pepper-sprayed him." Def. Facts ¶68. Defendants also claim that Panthera said, within hearing distance of Foltz, that the pepper-spraying was "bullshit" and without reason. *Id.* ¶¶69-72.

**C.     Panthera's Investigation and Discharge**

When Chief Houk learned on July 10, 2000 of Panthera's alleged communication with Foltz, he immediately placed Panthera on administrative leave. At Chief Houk's instruction, Capt. Vorderer called Panthera that day and left a voice mail message instructing him to turn in his badge, star, ID and keys. Defendants claim that Capt. Vorderer also told Panthera to report to his office. Def. Facts ¶78. Because Capt. Vorderer was unable to reach Panthera by phone, two sergeants went to Panthera's home to deliver an envelope with the Captain's message. Panthera was not home, so the sergeants left the envelope with his sister, who later gave it to Panthera. After receiving the envelope, Panthera then

6

retrieved Capt. Vorderer's voice mail message which, he says, did not include any specific instruction to report to the Captain's office. Pl. Facts ¶¶57-58; Pl. Resp. to Facts ¶78. In response to the envelope and voice mail message, Panthera contacted union officials to discuss why he had to go to the station. Def. Facts ¶¶84-85.

On the morning of July 11, 2000, Panthera reported to the station along with a union representative and turned in his star, badge and ID to the watch commander on duty, Lieutenant Spellman. Capt. Vorderer worked afternoons and was not in the station yet when Panthera arrived. According to Panthera, Lt. Spellman was unable to answer his questions about the situation and suggested that Panthera talk to Capt. Vorderer. Pl. Facts ¶61. Lt. Spellman states, however, that he specifically instructed Panthera to call Capt. Vorderer later that day to make an appointment to see him. DX 6, p. 20; Spellman Dep., p. 19. The parties agree that Lt. Spellman told Panthera that he was not allowed to be present at the station, though defendants qualify that Panthera could be there if he had business to conduct. Pl. Facts ¶62; Def. Resp. to Facts ¶62.

On July 14, 2000, Panthera and his union representatives met with Capt. Vorderer. Panthera was informed that the Department was commencing an investigation into his conduct and that Chief Houk had placed him on administrative duties status so that he would be present in the station in case they needed to ask him any questions relating to the investigation. Panthera was assigned to work with Lieutenant Smith and was responsible for compiling domestic violence statistics, completing front desk duty and performing various other tasks, all of which Panthera describes as "tedious." Def. Facts ¶¶88-89; Pl. Facts ¶74. However, at all times prior to his discharge, Panthera received his full salary and benefits. Def. Facts ¶¶90-92.

Beginning on July 10, 2000, Capt. Vorderer interviewed various members of the Department about Panthera. Panthera claims that throughout his career with the Department, he only received a single one-day suspension and a single written reprimand. Pl. Facts ¶80. Panthera's personnel file, however, indicates that he received a written reprimand on May 8, 1998 for negligently driving a police car; a one-day suspension on October 8, 1998 for negligently driving a police car without a seat belt; a written reprimand on May 5, 1999 for failing to appear in court on a DUI case; a one-day suspension on May 27, 1999 for failing to make an arrest; and a written reprimand on June 29, 1999 for again failing to appear in court. DX 2, Bates No. 373-79. Panthera also claims that Lt. Simon placed two made-up disciplinary memos in his file: a June 20, 2000 memo stating that Panthera's radio transmissions were too scratchy and a June 27, 2000 memo stating that Panthera was one minute late to roll call. Pl. Facts ¶82; PX V. However, there is no evidence in the record that Panthera did not engage in the cited misconduct, or that the memos were only placed in his file to build up his disciplinary record.

On August 9, 2000, Panthera was given a Notice of Interrogation informing him that the Department was commencing an investigation into three areas of alleged misconduct: (1) alleged insubordinate conduct in connection with the handling of the Service Merchandise call with Lt. Raglione on June 28, 2000; (2) alleged insubordinate conduct in Lt. Simon's office on June 30, 2000 when Officer Panthera communicated his concerns about Lt. Raglione's handling of the call; and (3) alleged insubordinate conduct in connection with the Christopher Foltz interaction on July 6, 2000. Pl. Facts ¶83; PX D. On August 16, 2000, Panthera was interrogated on these three subjects. Pl. Facts ¶84.

The investigation "dragged on and dragged on" until on November 7, 2000, a Statement of Charges ("administrative complaint") was filed with the Board of Fire and Police Commissioners of the Village of Oak Lawn (the "Board") seeking Panthera's termination. Pl. Facts ¶¶85, 87. Chief Houk and Capt. Vorderer were both involved in the decision to seek Panthera's termination, though Chief Houk apparently had the final word on that issue. *Id.* ¶¶89-91. The administrative complaint contained five charges. The first four concerned the allegations raised in the August 2000 Notice of Interrogation; namely, Panthera's conduct on June 28, June 30 and July 6, 2000. The fifth charge newly alleged that Panthera was insubordinate when he failed to report to Capt. Vorderer as ordered, and was the only charge seeking Panthera's termination. *Id.* ¶¶93, 94; Def. Facts ¶¶103-13.

On January 10, 2001, the Board conducted a hearing to address the five charges.[2] For reasons unknown to this Court, Capt. Vorderer did not give Panthera or his attorney a copy of Lt. Raglione's July 9, 2000 memo stating that he was unable to conclude that Panthera had been insubordinate on June 28 and 30, 2000. Pl. Facts ¶¶95-99. On February 8, 2001, the Board found Panthera guilty of all charges. PX L. Following a hearing on March 20, 2001, the Board discharged Panthera effective March 26, 2001. PX B; Pl. Facts ¶101; Def. Facts ¶123.

## DISCUSSION

Summary judgment is proper when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P.

---

[2]     The hearing originally commenced on December 6, 2000 but was continued at Panthera's request. DX 2, Report of Proceedings, p. 6.

56(c). In determining whether there is a genuine issue of fact, we view the evidence and draw all reasonable inferences in favor of the party opposing the motion. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255 (1986). When cross motions are filed, we apply the same standard to each motion. *Stimsonite Corp. v. NightLine Markers, Inc.,* 33 F. Supp. 2d 703, 705 (N.D. Ill. 1999).

## A.    Section 1983 Claims

In Counts 1 and 2 of the complaint, Panthera alleges that defendants violated 42 U.S.C. §1983 by depriving him of rights guaranteed by the Constitution while acting under color of state law. *See Brown v. City of Lake Geneva,* 919 F.2d 1299, 1301 (7th Cir. 1990); *Limes-Miller v. City of Chicago,* 773 F. Supp. 1130, 1135 (N.D. Ill. 1991). Specifically, Panthera claims that he was retaliated against for exercising his rights under the First Amendment, and singled out for differential treatment in violation of the Equal Protection Clause. The Court addresses each argument in turn.

### 1.    First Amendment Claim

In reviewing a §1983 retaliation claim based on the First Amendment, a court must engage in a three-step analysis:

> First, the court must determine whether the plaintiff's speech was constitutionally protected. If so, then the plaintiff must prove that the defendant's actions were motivated by the plaintiff's constitutionally protected speech. Finally, if the plaintiff can demonstrate that his constitutionally protected speech was a substantial or motivating factor in the defendant's actions, the defendant is given the opportunity to demonstrate that it would have taken the same action in the absence of the plaintiff's exercise of his rights under the First Amendment.

*Kuchenreuther v. City of Milwaukee,* 221 F.3d 967, 973 (7th Cir. 2000) (quoting *Kokkinis v. Ivkovich,* 185 F.3d 840, 843 (7th Cir. 1999)).

### a. Protected Speech

Under the *Connick-Pickering* test, statements are protected under the First Amendment if they may be "fairly characterized as constituting speech on a matter of public concern." *Connick v. Myers*, 461 U.S. 138, 146 (1983); *Pickering v. Board of Education of Township High School District 205*, 391 U.S. 563 (1968). To involve a matter of public concern, speech must "relat[e] to any matter of political, social, or other concern to the community." *Connick*, 461 U.S. at 146. If this requirement is met, the court applies the *Pickering* balancing test to determine whether "the interests of [the plaintiff], as a citizen, in commenting upon matters of public concern outweigh the interests of the [Village], as an employer, in promoting the efficiency of the public services it performs through its employees." *Kuchenreuther*, 221 F.3d at 973 (quoting *Connick*, 461 U.S. at 142) (internal quotations omitted).

Defendants argue that Panthera did not make any statements on matters of public concern which summarily defeats his First Amendment claim. According to defendants, Panthera's statements on June 28, June 30 and July 6, 2000 all related to "private disputes with his supervisor or private criticisms of another officer; and such statements on matters of solely a personal interest are not protected by the First Amendment." Def. Br., p. 3. Panthera insists that he was speaking out about police and public safety, and about the constitutional rights of a detainee. Pl. Br., p. 20.

### i. June 28 and 30, 2000

On June 28 and 30, 2000, Panthera complained that Lt. Raglione responded to the Service Merchandise call in a manner that put himself, other officers and civilians at risk. Specifically, Panthera (1) thought Lt. Raglione acted unprofessionally by flirting with the female keyholder and making "goo

11

goo eyes" at her; (2) believed that Lt. Raglione improperly failed to draw his weapon or respond to his radio because he was too busy flirting with the keyholder; and (3) disagreed with Lt. Raglione's decision to call out the fire department. In addition to these complaints, Panthera also (1) admitted to having a personal conflict with Lt. Raglione, who he felt was not treating him fairly; (2) indicated his belief that Lt. Raglione showed up at his calls too frequently and "more or less rides me"; (3) accused Lt. Simon of showing favoritism towards Lt. Raglione because of his rank; (4) stated that he (Panthera) would have been disciplined if he had failed to draw his gun or investigate the scene; and (5) in that regard, asked whether another officer had been reprimanded for leaving the scene of a burglary two weeks earlier. Panthera admits that during the conversation, he raised his voice, became argumentative, called Lt. Raglione by his first name, accused Lt. Raglione of giving him an illegal order and told Lt. Raglione that he respected his rank but did not respect Lt. Raglione as a man.

Whether an employee's speech addresses a matter of public concern must be determined by the "content, form, and context of a given statement, as revealed by the whole record." *Kuchenreuther*, 221 F.3d at 974-75. Here, Panthera apparently expressed concern about the safety of fellow officers and civilians if Lt. Raglione behaved in a similarly unprofessional manner in the future. Pl. Br., p. 20. Public and officer safety are certainly matters of public concern. *See Delgado v. Jones*, 282 F.3d 511, 517 (7th Cir. 2002). It is true that the majority of Panthera's statements reflect his personal conflict with Lt. Raglione, his difference of opinion as to the Lieutenant's decisions during the call, and his concern about favoritism with respect to disciplinary action. However, "[a] personal aspect contained within the motive of the speaker does not necessarily remove the speech from the scope of public concern." *Gustafson v. Jones*, 290 F.3d 895, 908 (7th Cir. 2002) ("*Gustafson II*")

12

(internal quotations omitted). And though "an employee's decision to deliver the message in private supports an inference that the real concern is the employment relation," *Wales v. Board of Education of Community Unit School District 300*, 120 F.3d 82, 84 (7th Cir. 1997), this is not decisive. *Gustafson v. Jones*, 117 F.3d 1015, 1018 (7th Cir. 1997) ("*Gustafson I*") ("speech that occurs wholly within a governmental entity may still touch on a matter of public concern"); *Delgado*, 282 F.3d at 518 ("the fact that [former police officer] Delgado communicated privately with his superiors does not make his speech less a matter of public concern").

Viewed in context, Panthera has raised a genuine issue of fact as to whether he was speaking out on a matter of public concern or merely airing internal employment complaints, such as his personal grievance with Lt. Raglione, his desire to be treated "fairly," and his concern that Lt. Simon failed to properly discipline Lt. Raglione. *See, e.g., Taylor v. Carmouche*, 214 F.3d 788 (7th Cir. 2000) ("statements made in an employment setting about how the tasks should be carried out are appropriate subjects for reaction by management, without constitutional obstacles"). The Court is skeptical that complaints about improper flirting by a lieutenant on one occasion[3] and about a decision to summon the fire department on a burglary call are issues of public concern, but summary judgment is not appropriate in the face of Panthera's evidence that he "intended to bring to light what [he] believed to be the negative law enforcement consequences of" Lt. Raglione's behavior. *Gustafson II*, 290 F.3d at 908.

---

[3]     The Court notes that although Lt. Raglione apparently frequently showed up at Panthera's calls, the Service Merchandise call was the first time Panthera ever reports observing Lt. Raglione flirting with someone at the scene.

### ii.    July 6, 2000

The Court next considers Panthera's statements to detainee Foltz on July 6, 2000.  Panthera claims that in the interest of completing a difficult booking process, he told Foltz that he could sue the Department if he was pepper-sprayed for no reason.  Defendants admit that Panthera may have stated that Foltz could – as opposed to should – file a lawsuit, which would be entirely proper.  According to defendants, however, Panthera also said that the pepper-spraying was "bullshit" and that the officer in question had no right to spray Foltz.  Panthera disputes that he made any such statements, raising a genuine issue of fact as to what Panthera actually said on July 6, 2000.  But even Panthera's version of events, if believed, does not constitute protected speech.  Panthera himself insists that he was merely trying to defuse a volatile situation and was *not* making any assessment about the actual propriety of the officer's conduct, of which he had no personal knowledge.  Pl. Facts ¶51.  The Court does not see how routine advice given during the booking process and designed solely to facilitate that process is a matter of public concern.  The general existence of constitutional rights may be of significance to the public, but Panthera's statements to Foltz in this context were not.  *See, e.g., Gonzalez v. City of Chicago*, 239 F.3d 939, 941 (7th Cir. 2001) (officer who completed routine official reports as part of his regular job duties did not speak on a matter of public concern even though the reports contained information that was of a public concern).

### iii.    Y2K Memo

Panthera also claims that he was retaliated against for writing a memo in December 1999 expressing his belief that the Department and the Village were not adequately prepared or trained for the Y2K transition.  Pl. Facts ¶6.  Assuming, *arguendo*, that this memo addressed a matter of public

concern, there is absolutely no evidence that it was in any way related to Panthera's suspension and ultimate discharge. *See Gustafson*, 290 F.3d at 906 (plaintiffs "must prove that their speech played at least a substantial part in the employer's decision to take an adverse employment action against them"). Thus, Panthera cannot claim retaliation arising from the Y2K memo.

In sum, Panthera has raised a genuine issue of fact as to whether he engaged in protected speech on June 28 and June 30, 2000, but he cannot sustain a First Amendment retaliation claim based on statements he made on July 6, 2000 or in his Y2K memo.

### b. *Pickering* Balancing

Having found a genuine issue of fact as to whether Panthera engaged in protected speech on June 28 and 30, 2000, the Court next considers whether Panthera's interests, as a citizen, in commenting upon matters of public concern outweigh defendants' interests in "promoting the efficiency of the public services [the Village] performs through its employees." *Kuchenreuther*, 221 F.3d at 973. Defendants argue that Panthera was sarcastic and disrespectful in speaking with Lt. Raglione and Lt. Simon, which was "reasonably likely to create problems in discipline or cause disharmony." Def. Br., p. 5; *Campbell v. Towse*, 99 F.3d 820, 829-30 (7th Cir. 1996) (the need for discipline and loyalty is especially important in law enforcement organizations). But Panthera disputes that he was disruptive or disrespectful, Pl. Br., p. 27, which precludes entry of summary judgment on this basis. *Gustafson II*, 290 F.3d at 909 ("*Pickering* balancing is not an exercise in judicial speculation. While it is true that in some cases the undisputed facts on summary judgment permit resolution of a claim without a trial, that means only that the *Pickering* elements are assessed in light of a record free from material factual disputes").

### c. Qualified Immunity

Defendants do not present any argument regarding whether Panthera's protected speech on June 28 and 30, 2000 motivated their decision to seek his suspension some two weeks later. Nor do they discuss whether Panthera would have been recommended for suspension and discharge notwithstanding his allegedly protected speech. Accordingly, defendants are not entitled to summary judgment on Count 1 of the complaint unless they can show that they are protected by qualified immunity. Qualified immunity "shields government officials performing discretionary functions from liability for civil damages 'insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Erwin v. Daley*, 92 F.3d 521, 525 (7th Cir. 1996) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). In evaluating this defense, the court must address two questions: (1) "whether the plaintiff has asserted a violation of a constitutional right at all"; and (2) "whether the plaintiff has demonstrated that the applicable constitutional standards were clearly established at the time in question." *Id.*

The Court has already determined that Panthera raised a genuine issue of fact regarding the protected nature of his speech on June 28 and 30, 2000, which satisfies the first part of the qualified immunity test. Defendants nonetheless argue that Panthera fails the second part of the test because he "cannot show that the standards in question at the time Defendants sought Plaintiff's termination clearly established that Defendants violated the First Amendment." Def. Br., p. 6. The Court disagrees. "It has been well established for many years in this Circuit that a public employer may not retaliate against an employee who exercises his First Amendment speech rights." *Delgado*, 282 F.3d at 520. *See also Gustafson II*, 290 F.3d at 913 (public employer could not have thought it was entitled to punish an

16

employee for speech on a matter of public concern "where the speech caused no actual disruption of any kind for four months, and where the employer neither articulates a belief that the speech has the potential to be disruptive in the future, nor has evidence to support the reasonableness of such a belief").

Defendants attempt to avoid this conclusion by arguing that Panthera's speech falls within the "wide gray area between the clearly legal and the clearly illegal, and [that] the rules of qualified immunity require giving the benefit of the doubt to the reasonable public official." Def. Br., p. 6 (quoting *Gustafson I*, 117 F.3d at 1021). This argument basically amounts to a claim that Panthera did not clearly indicate that he was speaking out about public safety, presumably because he simultaneously raised more personal concerns. But Panthera's version of what he said, if believed, would be sufficient to put defendants on notice that he was complaining about public safety, which is clearly protected under the First Amendment. *Gustafson I*, 117 F.3d at 1021 ("[i]t has . . . been clear for years that speech about police protection and public safety raises matters of public concern"). Defendants are not protected by qualified immunity and, thus, their motion for summary judgment on Count 1 of the complaint is denied.

### 2.    Equal Protection Claim

The Supreme Court has held that an equal protection claim may be brought by a person who is a member of a "class of one." *Village of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000) (per curiam). *See also Hilton v. City of Wheeling*, 209 F.3d 1005, 1007 (7th Cir. 2000). To succeed under this theory, Panthera must show that (1) he was "intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment" or (2) "the

17

government is treating unequally those individuals who are prima facie identical in all relevant respects, and that the cause of the differential treatment is a 'totally illegitimate animus toward the plaintiff by the defendant.'" *Nevel v. Village of Schaumburg*, 297 F.3d 673, 681 (7th Cir. 2002) (quoting *Albiero v. City of Kankakee*, 246 F.3d 927, 932 (7th Cir. 2001)). *See also Northwestern University v. City of Evanston*, No. 00 C 7309, 2002 WL 31027981 (N.D. Ill. Sept. 11, 2002) (discussing Seventh Circuit's treatment of traditional and vindictive action equal protection claims).

In this case, defendants argue that Panthera's equal protection claim fails as a matter of law because he cannot show that he was "treated differently than someone who is prima facie identical in all relevant respects." Def. Br., p. 7. *Purze v. Village of Winthrop Harbor*, 286 F.3d 452, 454-55 (7th Cir. 2002). As stated earlier, Panthera was accused of several incidents of insubordination and disloyalty between June 28 and July 6, 2000. He had a prior record of discipline including two suspensions and two written reprimands, and he was offered a 30-day suspension in lieu of going before the Board of Fire and Police Commissioners, which he declined. Def. Facts ¶100.

Panthera identifies five officers who he claims engaged in similar or worse conduct but received better treatment: Officer Kenneth Dangman, Sergeant Robert Johnson, Officer Daniel Miller, Officer James Sheridan and Officer James Chresaidos. Pl. Facts ¶¶ 108-12. Dangman engaged in similar misconduct by violating a direct order to appear before Capt. Vorderer, and he also had a prior disciplinary record. However, Dangman also received similar punishment; he was offered a 30-day suspension in lieu of dismissal. Sgt. Johnson engaged in misconduct similar to Panthera by failing to follow the orders of his superiors, which a reasonable jury could view as insubordination, and by violating a direct order to stay out of a particular tavern. And he had a prior record of discipline and

18

suspension. But like Panthera and Dangman, Sgt. Johnson was offered suspension in lieu of dismissal so he, too, received similar treatment. Miller is a closer call because he engaged in arguably more serious misconduct – allegedly sexually assaulting a woman – but received less punishment; on the other hand, Miller, unlike Panthera did not have any prior disciplinary record.

Officer Sheridan is a different story. Panthera has raised genuine issues of fact as to whether Sheridan engaged in similar misconduct when he vociferously argued with his superior about an assigned task using profanity in front of civilians and told the superior "you don't know what you're doing." A reasonable jury could conclude that Sheridan was insubordinate and had disobeyed a direct order. Sheridan, like Panthera, had a prior record – he had been suspended on four prior occasions for various offenses  but unlike Panthera, he was not even threatened with Board proceedings. Defendants have not offered any rational basis for this disparity in treatment, which is sufficient to defeat summary judgment on Count 2 of the complaint.

For similar reasons, a jury could reasonably conclude that defendants deliberately sought to deprive Panthera of his equal protection rights based on subjective ill will, which gives rise to a vindictive action equal protection claim. *See Albiero*, 246 F.3d at 932. In other words, a jury could find that defendants treated Panthera less favorably than Officer Sheridan "out of sheer vindictiveness." *Id.* (quoting *Esmail v. Macrane*, 53 F.3d 176, 178 (7th Cir. 1995)). If defendants "would have taken the complained-of action anyway, even if [they] didn't have the animus, the animus would not condemn the action." *Id.* ("[i]ll will must be the sole cause of the complained-of action"). But as noted earlier, defendants have not presented any argument in this regard. Accordingly, they are not entitled to summary judgment on Count 2 of the complaint.

### 3.    Individual Liability

The parties dispute whether Chief Houk and Capt. Vorderer may be individually liable under §1983. The Seventh Circuit has long held that "liability does not attach unless the individual defendant caused or participated in a constitutional deprivation." *Vance v. Peters*, 97 F.3d 987, 991 (7th Cir. 1996). In this case, Chief Houk and Capt. Vorderer jointly recommended that Panthera be brought before the Board for dismissal, which may have constituted a violation of his First Amendment and equal protection rights. These are "clearly established statutory or constitutional rights of which a reasonable person would have known." *Brokaw v. Mercer County*, 235 F.3d 1000, 1022 (7th Cir. 2000). Thus, Chief Houk and Capt. Vorderer may be liable on Counts 1 and 2 of the complaint.[4]

### B.    Administrative Review Claim

In Count 3 of the complaint, Panthera seeks reversal of the Board's decision terminating his employment. Review of an administrative agency's decision regarding discharge requires a two-step analysis. *See Krocka v. Police Board of City of Chicago*, 327 Ill. App. 3d 36, 46, 762 N.E.2d 577, 586 (2001); *Kappel v. Police Board of City of Chicago*, 220 Ill. App. 3d 580, 588, 580 N.E.2d 1314, 1320 (1991). First, the court must determine whether the agency's findings are "contrary to the manifest weight of the evidence." *Launius v. Board of Fire and Police Commissioners of City of*

---

[4]     The fact that the Board of Fire and Police Commissioners made the ultimate termination decision is insufficient to insulate Chief Houk and Capt. Vorderer from liability for their role in the process. *See Vance*, 97 F.3d at 993 ("[a]n official satisfies the personal responsibility requirement of section 1983 ... if the conduct causing the constitutional deprivation occurs at [his] direction or with [his] knowledge and consent. That is, he must know about the conduct and facilitate it, approve it, condone it, or turn a blind eye.... In short, some causal connection or affirmative link between the action complained about and the official sued is necessary for §1983 recovery") (internal quotations omitted).

*Des Plaines*, 151 Ill.2d 419, 427, 603 N.E.2d 477, 480-81 (1992). Second, the court must determine whether the findings of fact "provide a sufficient basis for the agency's conclusion that cause for discharge does or does not exist." *Kappel*, 220 Ill. App. 3d at 588, 580 N.E.2d at 1320. "[T]he agency's decision as to cause will not be reversed unless it is arbitrary, unreasonable, or unrelated to the requirements of service." *Krocka*, 327 Ill. App. 3d at 46, 762 N.E.2d at 586.

Panthera claims that the Board's decision to terminate his employment was against the manifest weight of the evidence. Generally, an administrative agency's findings of fact are considered *prima facie* true and correct. 735 ILCS 5/3-110; *Krocka*, 327 Ill. App. 3d at 46, 762 N.E.2d at 586-87. "Only if, after reviewing the evidence in a light most favorable to the Board, we determine that no rational trier of fact could have reached the conclusion reached by the Board are we able to overturn a decision under this standard." *Id.* (quoting *Chief Judge of Circuit Court v. American Federation of State, County and Municipal Employees, Council 31, AFL-CIO*, 153 Ill. 2d 508, 514, 607 N.E.2d 182, 185 (1992)).

The Board found that Panthera was insubordinate on June 28 and 30, 2000 by ridiculing and disobeying an order from a superior officer; that he was disloyal on July 6, 2000 when he criticized another officer's actions in pepper-spraying a detainee; and that he was insubordinate on July 10, 2000 by disobeying a direct order to report to Capt. Vorderer. DX 2, Bates No. 251-54. On the first four charges, Panthera argues primarily that they were insufficient in and of themselves to justify his termination. Pl. Br., pp. 39, 40. In any event, the evidence in the record supports the Board's findings on these charges. Lt. Raglione testified that Panthera failed to stay by him as directed during the Service Merchandise call, and Panthera himself admits that he ended up searching the warehouse alone

21

without having received any additional instruction to do so. In addition, Panthera admitted to raising his voice in his meeting with Lt. Simon and Lt. Raglione, and the record reflects that he accused the Lieutenant of making "goo goo eyes" at the female keyholder, which the Board could reasonably conclude constituted "ridicule" of a superior officer, a form of insubordination.

Panthera suggests that the Board would have reached a different conclusion with the benefit of Lt. Raglione's July 9, 2000 memo to Capt. Vorderer indicating that he could not substantiate a charge of insubordination. Pl. Br., p. 40. In essence, this amounts to a claim that Panthera was denied a fair hearing because defendants wrongfully withheld the memo, an issue he also raises by arguing that one of the Board members was biased in favor of Capt. Vorderer. In support of this argument, Panthera offers the affidavit of his attorney, David Matthews, who claims to have requested "all documents relevant to the charges brought against Plaintiff." However, Matthews does not indicate to whom he made such a request or when, or whether it was verbal or written. Pl. Facts ¶¶95, 96; Matthews Aff. ¶2. Panthera also claims that Chief Houk "was obligated under the rules of the Oak Lawn Fire and Police Commission to provide Officer Panthera with a copy of the [July 9, 2000 memo]." PX R, Second Request to Admit ¶4. But neither party has provided the Court with a copy of any Commission rule to that effect, which precludes any meaningful analysis on this point.

Even assuming that it was improper for defendants to withhold the memo from Panthera, there is no evidence that the error was material to the outcome of the case. Lt. Raglione and Capt. Vorderer both testified at the hearing and Panthera, who was represented by counsel, had the opportunity to cross-examine them regarding their views of his behavior. While it is true that Panthera's attorney may have asked different questions with the benefit of the memo, there is nothing in the record to suggest

22

that Lt. Raglione's initial belief that Panthera was not insubordinate during the Service Merchandise incident would have been sufficient to convince the Board to disregard the contrary testimony it heard from Lt. Simon and Capt. Vorderer. With respect to the issue of bias, the Court finds no evidence that the Board, which was expressly admonished to rule strictly on the evidence presented, failed to reach an impartial decision. Under the circumstances, Panthera has failed to show that he received an unfair hearing, and his arguments are insufficient to show that the Board's findings were arbitrary or capricious. *See Krocka*, 327 Ill. App. 3d at 49, 762 N.E.2d at 589 (plaintiff received fair hearing where he was represented by counsel, had an opportunity to be heard, cross-examined witnesses and presented no evidence of bias).

As noted earlier, the parties have different versions of what Panthera said to detainee Foltz on July 6, 2000. And Panthera is correct that his version, if believed, arguably would not support a finding of disloyalty. Nevertheless, the Board listened to the testimony, observed the witnesses and appears to have credited the testimony of the several officers who reported hearing Panthera tell Foltz to sue the Department because the pepper-spraying was "bullshit." This Court cannot properly disturb the Board's findings on this issue. *See Clark v. Board of Fire and Police Commissioners of Village of Bradley*, 245 Ill. App. 3d 385, 392-93, 613 N.E.2d 826, 831 (1993) ("[i]t is the function of the Board to determine the credibility of the witnesses").

With regard to the fifth charge, Panthera claims that he did not willfully disobey Capt. Vorderer's order because he turned in his star, ID card and keys as instructed and was not in fact ordered to report to Capt. Vorderer. But Capt. Vorderer and Lt. Spellman both testified that they specifically told Panthera to see the Captain, and the Board was free to believe their testimony. *See*

23

*Clark, supra.* Moreover, Panthera's own union representatives indicated that Panthera received an order to report to Capt. Vorderer. Officer Dennis Twomey stated that he was with Panthera when he turned in his equipment on July 11 and that Lt. Spellman told him to call Capt. Vorderer that afternoon at 3:00. DX 2, 1/10/01 Board Tr., p. 23, Bates No. 41. And sometime thereafter, Panthera left Officer Pat Barron a voice mail message asking him to "advise the Captain that he did receive his message and that he wishes to consult counsel prior to coming in." DX 2, Board Tr., p. 114.

Panthera makes much of the fact that Lt. Spellman told him that he was placed on administrative leave and was not supposed to be around the station. Pl. Br., p. 45. But this does not explain why Panthera never personally called Capt. Vorderer on July 11 as instructed, which would not require him to enter the station. For similar reasons, Panthera's arguments about the Illinois Peace Officers Disciplinary Act are also unavailing. The Act provides that an officer "shall have the right to be represented by counsel of his or her choosing and may request counsel at any time before or during interrogation." 50 ILCS 725/3.9. This provision might have applied if Panthera had actually gone to the Captain's office and discovered the purpose of the meeting. But he never even bothered to personally call Capt. Vorderer to state that he would be seeking representation prior to coming into the office. *See, e.g., Haynes v. Police Board of the City of Chicago*, 293 Ill. App. 3d 508, 512-13, 688 N.E.2d 794, 798 (1997) ("[a] police officer does not have the prerogative of actively disobeying an order from a superior while the officer subjectively determines whether the order is lawful, valid or reasonable because such a practice would thwart the authority and respect which is the foundation of the effective and efficient operation of a police force and destroy the discipline necessarily inherent in a paramilitary organization such as the police department"). And the fact that Panthera eventually

24

reported to Capt. Vorderer's office on July 14, 2000 did not cure his failure to report in a timely manner, or to at least call the Captain on July 11 as instructed. On these facts, the Court cannot say that the Board's finding that Panthera was insubordinate by failing to report to Capt. Vorderer was against the manifest weight of the evidence.

The only remaining question is whether Panthera's insubordination constituted cause for his termination. The Board has "considerable latitude" and "considerable discretion" in determining what constitutes cause for discharge. *Krocka*, 327 Ill. App. 3d at 47, 762 N.E.2d at 587. "Cause" for discharge has been defined as "some substantial shortcoming which renders the employee's continuance in office in some way detrimental to the discipline and efficiency of the service and which the law and sound public opinion recognize as good cause for his no longer holding the position." *Id.* (quoting *Kappel*, 220 Ill. App. 3d at 589, 580 N.E.2d at 1321). The Board found Panthera guilty of insubordination on three separate occasions, including disobeying a direct order from Capt. Vorderer. Illinois courts have held that "disobedience to a proper order given by a superior officer is cause for discharge." *See Nelmark v. Board of Fire and Police Commissioners of City of DeKalb*, 159 Ill. App. 3d 751, 759, 512 N.E.2d 1021, 1026 (1987); *Norman v. Board of Fire and Police Commissioners of City of Zion*, 245 Ill. App. 3d 822, 830, 614 N.E.2d 499, 504 ("in a police department the chief must command the respect and obedience of all officers in order to establish and maintain a leadership role").

The Court is mindful of the fact that the allegations regarding Capt. Vorderer occurred in July 2000 but did not appear in a charge until November 2000, even though Panthera was formally interrogated on the other four charges in August 2000. In addition, Panthera did eventually comply

25

with Capt. Vorderer's order, albeit three or four days late. And though he did not call Capt. Vorderer personally, he did ask his union representative to tell the Captain on July 12 that he wanted to consult with counsel prior to meeting with him. Moreover, Defendants' witnesses may have testified that Panthera was difficult or insubordinate towards them, but Panthera never received any disciplinary action for any of the events described by those witnesses.

Nevertheless, given the Board's findings that Panthera was repeatedly insubordinate and that he failed to obey, even for a short period, an order of his Captain, the Court cannot say that the Board "acted unreasonably or arbitrarily by selecting a type of discipline that was inappropriate or unrelated to the needs of the service." *Krocka*, 327 Ill. App. 3d at 48, 762 N.E.2d at 588 ("[a]s the reviewing court, we may not consider whether we would have imposed a more lenient disciplinary sentence"). *See also Norman*, 245 Ill. App. 3d at 830-31, 614 N.E.2d at 504-05 (discharge may be appropriate if the continued employment of an officer who disobeyed his superior officers would be detrimental to the discipline and effectiveness of the department).

Panthera raises one final challenge to the Board's decision: he claims that the Board could only discharge him on the basis of the fifth charge which accused him of failing to obey Capt. Vorderer's order, but that the fifth charge, standing alone, was insufficient to justify his dismissal. Pl. Br., p. 42. Panthera bases this argument on the fact that in the administrative complaint, defendants sought 30-day suspensions for the first four charges and dismissal only for the fifth charge. Contrary to Panthera's assertion, however, this does not mean that the Board, after hearing the evidence, was precluded from imposing more severe discipline than defendants had requested. *See Holden v. Police Board of City of Chicago*, 324 Ill. App. 3d 862, 755 N.E.2d 67, 74 (2001) ("if an administrative agency's

26

determination is not arbitrary or unreasonable, and does not involve the imposition of discipline unrelated to the needs of service, it will stand even if this court considers another sanction more appropriate") (quoting *Kloss v. Board of Fire and Police Commissioners of Village of Mundelein*, 96 Ill. 2d 252, 258, 449 N.E.2d 845, 849 (1983)). As stated earlier, the Court cannot say that the Board selected an inappropriate sanction for Panthera and will not reverse the Board's decision on this record.

## CONCLUSION

For the reasons stated above, defendants' motion for summary judgment [docket item #32-1] is granted as to Count 3 but is otherwise denied, and Panthera's motion for partial summary judgment [docket item #40-1] as to Count 3 is denied. On the Court's motion, the date for filing the final pretrial order is extended to November 8, 2002. No further extensions of that date will be permitted.

MATTHEW F. KENNELLY
United States District Judge

Date: October 10, 2002

27